EARL D. WILLIAMS, APPELLEE, v. WATSON BROS. TRANSPORTATION COMPANY ET AL., APPELLANTS.

16 N. W. 2d 199

FILED JANUARY 23, 1945. No. 31862.

*Votava & McGroarty* and *Lyle Q. Hills,* for appellants.

*George B. Boland* and *David D. Weinberg, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

SIMMONS, C. J.

This is a workmen's compensation case. Defendants appeal from a judgment of the district court awarding compensation to the plaintiff. We reverse the judgment and dismiss the plaintiff's petition.

Plaintiff in his petition in the compensation court alleged that while an employee of the defendant, Watson Bros. Transportation Company, as a truck driver, he, on July 7, 1943, received personal injuries arising out of and in the course of his employment, resulting in a concussion of the brain, with edema, possible skull fracture and an aggravation of pre-existing condition, and causing permanent and total disability.

Defendants by answer denied that plaintiff's condition was caused by accident or trauma, and denied liability. The matter was heard by one judge of the compensation court, who awarded compensation, from which the defendants appealed, with the result above indicated.

Some of the facts are not in dispute. There is dispute as to other facts and in the conclusion of the experts called by the parties.

For fourteen years prior to July 7, 1943, plaintiff had been a truck driver for defendant, and, with one exception, working steadily in a satisfactory manner and without accidents. It seems to be conceded that some ten years be-

fore the above date, plaintiff had contracted syphilis and had been treated therefor at the time. It was not disabling.

In April, 1941, he was driving a truck for the defendant near Iowa City, Iowa. He was found unconscious in the cab of his truck. The truck had been parked, brakes applied and motor cut off. Plaintiff was taken to a hospital in Iowa City, where his condition was diagnosed as meningo-vascular syphilis, with a cerebral thrombosis caused by the syphilis, then in the tertiary stage with a four plus Wassermann, which caused convulsive seizures. He had at least one severe convulsion while in the hospital that night. The attending physician, being without a history of the patient, examined for trauma and brain concussion, and found none. He examined for carbon monoxide poisoning, both by laboratory tests and physical examination, and found that the convulsions were not caused by gas poisoning, but were due to an involvement of the brain resulting from the syphilis. Plaintiff testified that the attack was brought on by being overcome by gas fumes from the truck. Plaintiff was taken the following day to a hospital in Omaha, where he was treated for syphilis. He remained off duty for several weeks, when he returned to work, and continued to work without interruption or incident until July 7, 1943. However, during that period of two years, he took regular treatments for his disease. The Wassermann was reduced from a four plus to a three plus positive.

On July 7, 1943, plaintiff was driving a truck consisting of a diesel-motored tractor and attached trailer, en route from Omaha to North Platte. On his direct examination, he testified that he noticed gas coming into the truck before he got to Wahoo, and that "it was gassing" and "I commenced to get sick, thats when I started to stop." He stopped at a point 14 miles west of Wahoo. On cross-examination, he stated that he had commenced to get sick east of Wahoo. He testified that the windows of his cab were "partly closed." He stopped the truck, turned off the ignition, put on the brakes, opened the door to get out and caught his heel "right on the end of the door" and fell to

the pavement. The evidence as to how his fall was caused is not contradicted.

It is to be noted that the pattern of the events of July 7, 1943, including plaintiff's explanation of the cause, follows the pattern of the events in April, 1941.

The testimony as to the cab windows is contradicted by the driver of a truck who came upon the scene shortly thereafter, and who examined the truck and testified that the windows were down. Plaintiff's testimony as to the gassing is corroborated by a fellow employee who passed him a few miles to the east and who testified that his truck was then enveloped in black smoke. The evidence is that the exhaust of the truck was on the right side, extended to the rear of the tractor where the outlet was located. Plaintiff testified that the wind was from the east and blowing in the direction of his movement. The evidence, however, is uncontradicted that the engine of this tractor had been completely overhauled three weeks before the event, was in good mechanical condition, and when driven away from the scene, was in good order. The doctor who treated plaintiff immediately following the event, testified that he had no symptoms of gas poisoning and that "it could not be from gas poisoning." The trial court specifically found that plaintiff's "sickness was not caused by the exhaust gas of the truck." With that finding we agree.

Shortly after the accident, the truck driver came upon the scene, saw plaintiff with his head on the pavement and his feet on the running board. This driver stopped, could hear plaintiff breathing heavily at a distance of 40 to 50 feet, went to him, found his face dark in color, he was frothing at the mouth and his legs kicking. This driver and his wife got plaintiff to the rear of the truck where he had another convulsion. They sent for help and a first-aid car and the sheriff came.

The evidence of the driver, the sheriff, the first-aid man and the doctor as to visible injury to plaintiff's head is that he had an "abrasion" on his forehead. The doctor described it as "very mild" and not having the appearance of

being caused by a severe blow. He treated and bandaged it as a matter of caution. They testify that there was no bleeding and one witness testified that there was some swelling. Plaintiff's wife, who later saw him in the hospital, testified to extensive lacerations, bruises, cuts and a black eye. She further testified that his cap, when found in the truck, was "full of blood in the top." The doctor who examined the plaintiff on July 9, 1943, found "a lot of bruises over his right eye and the forehead." We are of the opinion that the testimony of the wife as to the extent of the visible injuries was an exaggeration.

Plaintiff was taken in the first-aid car to a hospital in Wahoo. Shortly before his arrival there he had a convulsion. He was either unconscious or mentally confused when he reached the hospital. Plaintiff had another convulsion at the hospital, and the doctor administered chloroform which quieted him. He started another convulsion and the doctor administered sodium amytal, which was effective. His mind was still confused the following morning, which could have resulted from the drug that was administered.

Plaintiff, when three years old, had been kicked in the head by a horse, resulting in the loss of an eye. The doctor at Wahoo at the time was of the opinion that these convulsions might have been brought on as a result of the old injury. He did not have the history of syphilis.

On the day following, plaintiff was taken from the hospital to his home in Omaha. There, on July 9, he was examined by a physician, his mind was clear and he complained of a headache. On July 11, his mind was confused and he had developed "a weakness in his arm and face." He was sent to a hospital and specialists called.

This physician testified that in his opinion, the plaintiff was overcome by gas, fell on his head causing an injury to his brain tissue causing edema, and that it "set up some damage which prevented him from coming back to his normal self"; and that plaintiff's syphilitic condition made him more liable to trouble from trauma than an ordinary person. He further testified that in order to aggravate the

pre-existing condition, there must be a blow severe enough to do some injury to the brain, and that the plaintiff in his opinion had sustained a concussion.

On July 13, 1943, plaintiff was examined by a specialist in neurological surgery. He was given plaintiff's history. Plaintiff was conscious but mentally confused, was not in pain, but had a slight weakness of the right arm and right side of the face. A trephine operation was recommended to determine whether or not there had been a hemorrhage and collection of blood. The opening was made in the left temple. Evidence of hemorrhage, injury to the brain or the membrane surrounding the brain, or trauma, was not found. The brain was found reduced in size, was not swollen and there was an excess of cerebro-spinal fluid on the outside in the fissures of the brain, where it lies "because something has to fill up this space." The specialist further testified that there was no edema; that this term means an increase of fluid in the tissue causing a swelling; and that the condition found was just the opposite. He further testified that convulsions caused by brain injury usually happen a considerable time after the injury when scar tissue has grown into the site of the injury.

On July 23, 1943, plaintiff was referred to a specialist in neurosyphilis for treatment, has since been under his care, and has been receiving chemical injections and fever treatment for his disease. As of January 17, 1944, this witness testified that plaintiff was suffering from an organic brain disease known as general paresis. This specialist reviewed the entire history, including his own treatment, the convulsions, the momentary warning that often comes of their approach, the ability to work, the progress of the disease from its intermediate stage of meningo-vascular syphilis to paresis, the brain atrophy, the excess of cerebro-spinal fluid, the absence of evidence of trauma, and gave it as his opinion that the plaintiff on July 7, 1943, suffered a convulsion as the result of his disease, and that his condition since is the result of the normal progress of the disease, in no wise affected by the event of that date. He further

testified that the reduction of the positive Wassermann from a four plus to a three plus before July 7, 1943, was not of importance, as it still showed the disease to be active. He further stated that a brain concussion would aggravate the disease, but that there must be an active brain injury.

In this connection, it is to be noted that while there was a dispute as to the extent of the visible head injury, as pointed out herein, there was no dispute as to the findings of the neurological surgeon that there was no brain injury, and no dispute as to the positive findings which negatived that conclusion.

The applicable rules are: "To sustain a claim for compensation under the workmen's compensation act, the employee has the burden of establishing by a preponderance of the evidence that he has incurred a disability arising out of and in the course of his employment. * * * This proof must be made by evidence leading either to the direct conclusion or to a legitimate inference that such is the fact. * * * An award cannot be sustained if based upon possibilities, probabilities, conjectural or speculative evidence." *Feeney v. City of Omaha,* 140 Neb. 497, 300 N. W. 571.

We reach the conclusion that the head injury which the plaintiff received on July 7 is not shown to have been in any wise a causative factor in plaintiff's disability. A contrary conclusion is clearly indicated. There remains, of course, the possibility that it may have been so caused, but that is·not sufficient to establish the right to compensation. In reaching this conclusion, we are mindful of the testimony of the doctor, who examined plaintiff on July 9, to the effect that the injury of July 7 aggravated his disease and contributed to his disability. His opinion cannot be accepted as controlling. It is based on the premise of the plaintiff having been overcome by gas, and to his having had an injury to the brain tissue, an edema and a concussion. Here the premise being false, the conclusion based thereon cannot be accepted as true.

The value of the opinion of an expert witness is depend-

ent on, and is no stronger than, the facts on which it is predicated. The opinion has no probative force unless the premises upon which it is based are shown to be true. 32 C. J. S., sec. 569, p. 395.

It necessarily follows that the trial court erred in awarding compensation. The judgment of the trial court is reversed and plaintiff's petition dismissed.

REVERSED AND DISMISSED.